| | |
|---|---|
| District Court, Adams County, Colorado<br>Court Address: 1100 Judicial Center Dr.<br>Brighton, CO 80601<br>(303) 659-1161 | DATE FILED: April 1, 2019 3:19 PM<br>FILING ID: 7908B32649B22<br>CASE NUMBER: 2019CV30518 |
| **PLAINTIFF:** DAVID AGHAMALIAN, Individually and on Behalf of All Others Similarly Situated,,<br><br>v.<br><br>**DEFENDANT:** OURPET'S COMPANY, STEVEN TSENGAS, JOSEPH T. AVENI, WILLIAM L. LECHTNER, CHARLES C. MACMILLAN, and JOHN SPIRK. | **COURT USE ONLY** |
| **Attorneys for Plaintiff:**<br>KAREN CODY-HOPKINS# 35367<br>CODY-HOPKINS LAW FIRM<br>4610 S. Ulster St #150<br>Denver, CO 80237<br>T; 303-221-4666 F: 303-221-4374<br>E: karen@codyhopkinslaw.com<br><br>*Additional attorneys listed below* | Case No.:<br><br>Div.: |

| |
|---|
| **CLASS ACTION COMPLAINT WITH JURY DEMAND** |

Plaintiff David Aghamalian ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including the investigation of counsel and a review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this shareholder class action on behalf of himself and all other similarly situated former public shareholders of OurPet's Company ("OurPets" or the "Company") against the Company and the former members of the Company's board of directors (the "Board" or the "Individual Defendants"). Plaintiff alleges the Individual Defendants violated C.R.S. 7-108-401 and breached their fiduciary duties of good faith, care, and loyalty in connection with the merger (the "Merger") between OurPets and Hyper Pet LLC ("Hyper Pet"), whereby the Individual Defendants orchestrated a flawed and conflicted sales process extracting personal

**EXHIBIT A**

benefits separate from OurPets' common shareholders and forced Plaintiff and the putative class to exchange their shares in the Company for inadequate consideration.

2.      Plaintiff also brings separate claims against Steven Tsengas as OurPets' President and CEO and as a controlling shareholder for breaching the fiduciary duties of care, loyalty, and good faith owed to the Company's other public shareholders in his capacity as an officer and controlling shareholder of OurPets.

3.      Plaintiff also brings a separate claim against OurPets for aiding and abetting the remaining Defendants' breaches of fiduciary duty.

4.      OurPets is a Colorado corporation that maintains its principal executive offices in Fairport Harbor, Ohio.  OurPets manufactures, distributes, designs, markets, and sells a broad line of consumable pet products in the U.S. and overseas.

5.      On December 18, 2018, OurPets announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with Hyper Pet, through its subsidiaries. Pursuant to the terms of the Merger Agreement, each share of OurPets common stock issued and outstanding would be converted into the right to receive $1.00 in cash (the "Merger Consideration").  This was the case for all common shareholders except for Steven Tsengas, Konstantine (Dean) Tsengas, and PZ Holdings Ltd.[1] (collectively, the "Rollover Shareholders") who entered into a contribution and unit subscription agreement with Hyper Pet's parent entity ("GRAC") pursuant to which they will contribute approximately 20% of their equity in the Company in exchange for units of membership interest in the combined company (the "Rollover Agreement"). This means that the Rollover Shareholders will continue to participate in the future growth of the Company while stripping the same opportunity from the Company's minority shareholders. This creates competing interests between the Rollover Shareholders, and their affiliates, and the minority shareholders and resulted in the unfairly depressed Merger Consideration.

6.      The Merger Consideration, the sales process the Individual Defendants conducted prior to entering into the Merger Agreement, and the terms of the Merger Agreement were fundamentally unfair to OurPets' former public shareholders. The $1.00 per share Merger Consideration represented a 35% *discount* to the Company's 52-week high closing price of $1.54. Plaintiff's and the Class' shares were worth significantly more than the Merger Consideration. There was no need for the Company to enter into a merger, and the Company had other viable strategic alternatives to increase shareholder value. Nevertheless, the Individual Defendants orchestrated and/or agreed to the unfair Merger Consideration because their interests were not aligned with the interests of the Company's public shareholders.

---

[1]      As explained further below, two of the Company's directors John Spirk and Charles MacMillan were affiliates of PZ Holdings. Therefore, the Merger was consummated to extract unique benefits for a majority of the Board separate from OurPets common holders.

7.     Amongst other divergent interests, the Rollover Shareholders, including Defendants Steven Tsengas, Charles MacMillan, and John Spirk—a majority of the Board—will continue to share in the future earnings of the Company. Further, upon the closing of the merger, Steven Tsengas will enter into a consulting agreement with Hyper Pet. Under this agreement, Steven Tsengas will serve as the New Product Consultant of Hyper Pet to assist Hyper Pet's new product development teams. Additionally, Dean Tsengas[2] will enter into an employment agreement with Hyper Pet. Under this agreement, he will serve as the Executive Vice President of Operations of Hyper Pet. For his services, Dean Tsengas will be paid an annual salary of $185,000, and he is eligible for a performance bonus each year with a minimum target of 20% of his base salary. Moreover, Senk Properties LLC, an entity entirely owned by the Tsengas family will continue in its lease agreements with the post-Merger company. Finally, Nottingham-Spirk Design Associates, Inc., a company founded by John Spirk, will continue in its development agreements with the post-Merger company.

8.     Still worse, the Individual Defendants and their affiliates controlled over 54% of the Company's outstanding common stock and entered into voting and support agreements to vote all of their shares in favor of the Merger. The Merger only required approval by a simple majority of common shares, and the Individual Defendants declined to implement a "majority of the minority" voting requirement; thus, Plaintiff and the Class were unable to prevent the Merger from being consummated.  Individual Defendants request for shareholders to vote on the Merger was therefore illusory, as their votes could not stop the Merger from going forward.

9.     The Merger was the result of a fundamentally flawed and conflicted sales process, during which: (i) the Individual Defendants constructed a conflicted Special Committee; (ii) the Special Committee failed in its task to provide procedural safeguards from the conflicted officers, directors, and the controlling shareholder; (iii) the Individual Defendants rejected more lucrative offers to engage in a transaction with Hyper Pet; (iv) the Individual Defendants shunned Party F, among others, and entered into exclusivity with Hyper Pet allowing Hyper Pet to substantially reduce its offer, after which the Individual Defendants made no efforts to reengage with Party F or any other party; (v) the Rollover Shareholders secured the unique benefits of the Rollover Shares; (vi) the Individual Defendants agreed to lock up the deal with preclusive deal protection devices; (vii) the Individual Defendants entered into the Voting and Support Agreement assuring the approval of the Merger; and (viii) the Individual Defendants failed to include any type of majority of the minority voting provision to protecting the rights of minority shareholders. Based on the preferential treatment Hyper Pet was given during the sales process it appears that Hyper Pet was Defendants' preferred bidder.

10.     As alleged in greater detail herein, the Individual Defendants agreed to and negotiated the terms of the Merger in breach of their fiduciary duties they owed directly to Plaintiff and other similarly situated OurPets shareholders, including their duty to produce to each

---

[2]     Dean Tsengas is the son of Steven Tsengas, the Vice President of Operations and Secretary for the Company, the holder of over 5% of OurPets outstanding stock, and a Rollover Shareholder. Dean Tsengas is the third largest shareholder of the Company after his father and PZ Holdings.

shareholder the best possible return for their investment. The Individual Defendants failed to conduct a fair sales process and, instead, placed their own personal interests ahead of the Company's former public shareholders and tailored the sales process to favor Hyper Pet, the Individual Defendants' favored suiter.

11.     Compounding their failure to obtain fair consideration for OurPets shareholders, the Individual Defendants agreed to lock up the Merger with deal protection devices that impeded and/or discouraged other bidders from making successful competing offers for the Company. For example, the Board agreed to: (i) a "no-solicitation" provision that prevented the Company from soliciting, initiating, encouraging, or facilitating the making of any competing proposal or offer; (ii) an "information rights" provision that granted Hyper Pet access to any rival bids, the material terms thereof, and the bidder's identity; (iii) a "matching rights" provision that provided Hyper Pet with two business days to match any competing proposal in the unlikely event that one emerged; and (iv) a prohibitive termination fee that would require OurPets to pay Hyper Pet $750,000 in the event they accepted a superior offer.

12.     Collectively, the Merger Agreement's deal-protection provisions improperly restrained the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives to the Merger that were in the best interests of the Company's public shareholders.

13.     The Individual Defendants further exacerbated their breaches of fiduciary duty by disseminating a materially incomplete and misleading definitive proxy statement (the "Proxy") to the Company's shareholders on February 13, 2019.[3] As set forth in greater detail below, the Proxy contained materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the valuation analyses conducted by Boenning & Scattergood, Inc. ("Boenning"), the financial advisor OurPets hired to perform the fairness opinion; (iii) the background to the Merger; and (iv) the conflicts of interest faced by Falls River Group, LLC an Affiliate of StillPoint Capital, LLC ("FRG") that was the primary financial advisor for the sales process leading up to the Merger. The omission and/or misstatement of this material information rendered OurPets shareholders incapable of making an informed vote on the Merger.

14.     Even though the approval of the Merger was rendered fait accompli by the Voting and Support Agreement and the lack of any procedural safeguards to protect the rights of minority shareholders, a special meeting and shareholder vote was held on March 7, 2019 (the "Shareholder Vote"). There, the minority shareholders were forced by Individual Defendants, through the materially incomplete and misleading Proxy, to cast an uninformed vote on the Merger.

---

[3]     Plaintiff references the Proxy herein *solely* for the purpose of alleging that the Defendants breached their fiduciary duty of candor by failing to include material information in the Proxy, and that the shareholder vote on the Merger was therefore not fully informed. Plaintiff does not incorporate all of the various factual assertions contained within the Proxy, and does not accept all of the Proxy's statements as true.

15.     The totality of the Individual Defendants' conduct constituted a breach of their fiduciary duties owed directly to OurPets' public shareholders, and a violation of applicable legal standards governing their conduct.

16.     For these reasons and as set forth in detail herein, Plaintiff seeks equitable relief in the form of rescission of the Merger and/or Merger Agreement, or in the event rescission is not available, rescissory damages resulting from the Individual Defendants' violations of their fiduciary duties owed directly to the Company's shareholders, in an amount to be determined at trial.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over each Defendant because OurPets is a Colorado corporation and the Individual Defendants were each a director and/or officer of the Company and have sufficient minimum contacts with Colorado as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court under C.R.C.P. 98 because OurPets is incorporated in Adams County, Colorado. Thus, at least one Defendant resides and/or has a place of business in this County.  Venue is also proper in this Court because Plaintiff asserts claims arising solely under Colorado state law.

## PARTIES

19.     Plaintiff is a citizen of Florida and was, at all times relevant hereto, a common shareholder of OurPets since prior to the wrongs complained of herein.  Plaintiff owned approximately 54,951 shares of OurPets common stock prior to the Merger.  Plaintiff did not vote in favor of the Merger. As a result of the Merger, Plaintiff had his shares cashed out for the inadequate Merger Consideration.

20.     Individual Defendant Steven Tsengas is a director of OurPets, the Chairman of the Board, and the Founder, President, and Chief Executive Officer of the Company. He is the Company's largest shareholder by a large margin and together with his son, Dean Tsengas, he controls over 31% of the Company's outstanding common stock. Additionally, he is the managing partner of Senk Properties.

21.     Individual Defendant Joseph T. Aveni has been a director of the Company since 1998.  He was deemed independent and selected to serve on the special committee for the 2014 sales process; however, he was omitted from the special committee for the current sales process that resulted in the Merger.

22.     Individual Defendant Charles C. MacMillan has been a director of the Company since 2012.  He was appointed to serve as one of two members of the special committee at the beginning of the sales process. Despite repeatedly being referred to as "independent," MacMillan is in fact is the Treasurer and Secretary of PZ Holdings Ltd., one of the Rollover Shareholders. He

was previously the Chief Financial Officer of Pet Zone Products, Ltd. prior to their acquisition by OurPets. Additionally, he is the CFO of Capital One Partners, the parent/majority owner of PZ Holdings.

23.     Individual Defendant William L. Lechtner has been a director of the Company since 2012. He was appointed to serve as one of two members of the special committee at the beginning of the sales process.

24.     Individual Defendant John Spirk has been a director of the Company since 2006. He is a significant owner of PZ Holdings though Spirk Ventures, Ltd, where he is the general partner. Additionally, he is the co-founder and co-president of Nottingham-Spirk Design Associates, Inc.

25.     Defendant OurPets is a Colorado corporation that maintains its principal place of business at 1300 East Street Fairport Harbor, Ohio 44077. The Company develops and markets proprietary products for improving the health, safety, comfort and enjoyment of pets. OurPets common shares were traded on OTC under the ticker symbol "OPCO."

26.     The parties identified in ¶¶ 20-25 are collectively referred to as the "Defendants."

## RELEVANT NON-PARTIES

27.     Hyper Pet is a privately-owned company that retails pet products and supplies. The Company offers doggie tail, hyper squawkers, flippy flopper, tennis balls, and other pet products. Hyper Pet is a private company that operates in the State of Kansas. Hyper Pet is wholly owned by GRAC Holdings LLC ("GRAC"), a Delaware limited liability company and holding company affiliated with Guardian Capital Partners, LLC ("Guardian"), a Delaware limited liability company and private investment firm. The owners of membership units of GRAC are contributing a portion of the equity required to finance the merger.

28.     Dean Tsengas is the son Steven Tsengas, the Vice President of Operations and Secretary for the Company, the holder of over 5% of OurPets outstanding stock, and a Rollover Shareholder. Dean Tsengas is the third largest shareholder of the Company after his father, Steven Tsengas, and PZ Holdings.

29.     PZ Holdings Ltd. ("PZ Holdings"), formerly known as Pet Zone Products Ltd., was acquired by OurPets in 2006. Capital One Partners, LLC, a private equity investment firm, owns a majority of the membership interests in PZ Holdings Ltd. Spirk Ventures, Ltd. is also a significant owner in PZ Holdings.

## THE FIDUCIARY DUTIES OF DIRECTORS, OFFICERS, AND CONTROLLING SHAREHOLDERS

30.    By reason of the Individual Defendants' positions as directors and/or officers of OurPets, said individuals were in a fiduciary relationship with Plaintiff and the other public shareholders of OurPets, and pursuant to C.R.S. 7-108-401, owed Plaintiff and the other members of the Class (defined herein) the duties of loyalty, good faith, and care. Additionally, under Colorado law "[f]iduciary duties require directors and controlling shareholders to act with loyalty toward the corporation, and with an extreme measure of candor, unselfishness, and good faith. The fiduciary duties of a director or controlling shareholder are equivalent to the high standard of duty required of trustees." *Kim v. Grover C. Coors Trust*, 179 P.3d 86 (Colo. App. 2007). Each of the Individual Defendants were required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.

31.    Arising from their duties of care, loyalty, and good faith the Individual Defendants had a duty to take all reasonable and necessary actions to produce to each shareholder the best possible return for his investment—*i.e.* maximize the value obtained for shareholders in a change-of-control transaction such as a cash-out merger. This duty also requires the Individual Defendants to reject inadequate offers to purchase the Company and to maintain the Company's operations as a standalone entity if the alternative was a sale at an inadequate price. The Individual Defendants were obligated to seek the path offering the best value reasonably available to the shareholders, which could be remaining independent and not engaging in any transaction at all.

32.    In a situation where the directors and officers of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps necessary to maximize the value shareholders will receive or obtain a sizeable premium. To diligently comply with this duty, the directors of a corporation may not take any action that:

    (a)    adversely affects the value provided to the corporation's shareholders;

    (b)    contractually prohibits them from complying with or carrying out their fiduciary duties;

    (c)    discourages or inhibits alternative offers to purchase shareholders' shares;

    (d)    will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

    (e)    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

33.    Further, when directors and officers agree to a transaction that requires shareholder approval, they have a duty to disclose all information that is material to the shareholders' consideration of the transaction that can reasonably be obtained through their position as directors and officers.

34. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Merger, violated duties owed directly to Plaintiff and the other former public shareholders of OurPets, insofar as they, *inter alia*, failed to obtain the best price possible or a reasonable premium under the circumstances before entering into the Merger; abandoned other viable strategic alternatives and business plans to maximize shareholder value; agreed to unreasonable deal protection devices that all but ensured that OurPets shareholders would not receive a superior offer; engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the other holders of OurPets common stock; and disseminated a materially incomplete and misleading Proxy to the Company's shareholders which deprived them of the ability to make an adequately informed decision concerning whether or not to vote in favor of the Merger Agreement.

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action on his own behalf and as a class action on behalf of all former holders of OurPets stock who received the inadequate Merger Consideration (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

36. This action is properly maintainable as a class action pursuant to C.R.C.P. 23. The Class is so numerous that joinder of all members is impracticable. As of the record date, February 1, 2019, there were 20,066,180 shares of OurPets common stock outstanding, owned by numerous shareholders.

37. There are questions of law and fact which are common to the Class and which predominate over any questions affecting only individual members, including *inter alia*, the following:

     (a)    whether the Individual Defendants breached their fiduciary duties owed to Plaintiff and the Class;

     (b)    whether the Individual Defendants engaged in a scheme to benefit themselves at the expense of OurPets shareholders in violation of their fiduciary duties;

     (c)    whether the Individual Defendants acted in furtherance of their own self-interest to the detriment of the Class;

     (d)    whether Steven Tsengas breached the fiduciary duties he owed to the Company's public shareholders in his capacity as controlling shareholder of the Company;

     (e)    whether OurPets aided and abetted the other Defendants' breaches of fiduciary duty; and

     (f)    whether Plaintiff and the other members of the Class have been harmed as a result of the Defendants' alleged wrongdoing.

38. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other

members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

39.    The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.  In view of the complexity of the issues or the expense of litigation, the separate claims of individual Class members are insufficient in amount to support separate actions. Further, the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## FURTHER SUBSTANTIVE ALLEGATIONS

### I.    Background of the Company

40.    OurPets designs, develops, produces, and markets various accessories and consumable pet products for enhancing the health, safety, comfort, and enjoyment of pets in the United States and internationally. It offers various pet products, such as dog, cat, and bird feeders; storage bins; dog and cat toys; cat and dog waste management products; catnip products; scratchers and cat treats; dog houses, bowls, and molds; cat litter, litter box accessories, and disposable litter boxes; and pet supplements. The company markets and sells its products under the OurPets, PetZone, Flappy, SmartScoop, EcoPure Naturals, Play-N-Squeak, Durapet, Clipnosis, Go! Cat! Go!, Festiva, Eat, Smarter Toys, petzonebrand.com, and Cosmic Pet brands. It serves mass retailers, pet superstores, regional pet chains, pet catalogues, e-commerce, warehouse club stores, military exchange chains, grocery chains, and pet distributors

41.    OurPets was founded by Steve Tsengas in 1985 under the name Napro, Inc. as an enterprise for launching new ventures and acquiring companies in various lines of business. The Company changed its name to OurPets Company in March 1998 after a merger. In January 2006, OurPets purchased substantially all the assets of Pet Zone, a competitor that manufactured and distributed cat, dog and bird feeders, storage bins, and cat and dog toys to the pet specialty, mass retailers and grocery chains. In July 2010, OurPets purchased substantially all the assets of Cosmic Pet Products, a leading provider of catnip products, cat toys and other cat products such as scratchers and cat treats.

42.    OurPets sales increased by approximately $3,251,000, or 13.6%, to $27,070,160 in 2016 from $23,819,189 in 2015. Volume increases accounted for most of this growth with sales to national chains accounting for about 89% of the increase.  Sales to national chain customers increased by approximately $2,810,000 from 2015 to 2016, followed by sales to distributors,

which grew by approximately $181,000 during the same time period.  Net income increased by $807,681, from $1,336,912 in 2015 to $2,144,593 in 2016

43.    OurPets offers approximately 1,000 exciting proprietary products specifically related to healthy feeding systems, interactive toys, healthy consumables, and cat and dog maintenance products.  OurPets has been granted 93 U.S. and international patents and an additional 58 are pending.  OurPets has also obtained 62 trademarks and has another 24 pending. Through its product development efforts, OurPets hopes to introduce new, exciting products each year.

44.    OurPets has built an extensive domestic and international marketing network that allows a growing number of products to be sold at continually improving economies of scale. The company's products are marketed through pet specialty distributors and retail chains such as PetSmart and Petco, grocery chains such as Kroger and Publix, mass retailers such as Wal-Mart and Kmart, catalogs such as Drs. Foster & Smith, and E-commerce websites. Overseas sales in the United Kingdom, Japan, Canada, Australia, etc. are through local, independent representatives/distributors.

45.    According the Company's website: In order to effectively handle the anticipated rapid revenue growth and achieve consistent profitability and high return-on-investment (ROI), OurPets dynamic organization focuses on product development, marketing and distribution and subcontracts its manufacturing operation and various other activities to strategic partners throughout the world. Barring the impact from any major factors beyond its control, OurPets strategic business plan calls for annual year over year sales growth of 15%-20% with targeted net income as a % of sales is in the 10%-12% range.

46.    Although past growth has been "organic" or internal, OurPets is positioned to pursue growth through strategic acquisitions offering marketing or technology competitive advantages. This optimistic outlook is based on the continued healthy growth of the pet industry, the rapid growth of the company's key customers such as Walmart, Petsmart, Amazon, and Petco, OurPets aggressive development and marketing of proprietary products, the expansion within its current marketing base, penetration into new market segments and the future contributions of OurPets experienced, highly motivated team.

47.    There are very limited opportunities for the individual investor to participate in the rapidly growing pet industry because most of the companies in this industry are privately held. PetsMart (retailer) (PETM), Central Garden & Pet (pet products distributor) (CENT) and OurPets (OPCO) (proprietary product manufacturer/marketer) represent most of the limited investment vehicles available to the individual investor. OurPets began trading in December 2001 under the symbol "OPCO" (OTCQX).

## II.    The Individual Defendants Conduct a Flawed and Conflicted Sales Process

48.    In the fall of 2016, the company's management had discussions with FRG concerning strategic alternatives, including the sale of OurPets. On December 7, 2016, the board held a meeting to review the company's long-range business plan and market analysis provided by FRG. The board members voted to approve exploring possible alternatives for the company with FRG. On January 1, 2017, OurPets engaged FRG to act as the company's exclusive financial advisor in connection with exploring strategic alternatives.

49.    On March 22, 2017, FRG launched marketing efforts, contacting a mix of 53 qualified financial sponsors and strategic acquirers. Over the course of the next several weeks, 23 parties executed a confidentiality agreement and reviewed an information memorandum on the company. However, the Proxy is silent as to whether any of these confidentiality agreements contained standstills and/or "don't ask don't waive" provisions.

50.    On May 10, 2017, the Board recognized the disabling conflicts facing its members and made a superficial attempt to remove the taint of conflict by appointing an "independent" special committee (the "Special Committee") for the sales process. However, it is clear that the Board failed to take this critical task seriously for two distinct reasons. First, the Board appointed a conflicted director to the special committee in MacMillan. As mentioned above, MacMillan is an affiliate of PZ Holdings, the Company's second largest shareholder at nearly 16% of the Company's outstanding common stock, and therefore has interests different from OurPets common shareholders. This conflict of interest was explicitly illustrated when PZ Holdings along with the Tsengas entered into the Rollover Agreement.

51.    Second, the Special Committee entirely failed in its mandate to keep the negotiations of the Merger sales process independent from the remaining Board members. In fact, Steven Tsengas, the Company's Chairman of the Board and controlling shareholder, was thoroughly involved in the negotiations and repeatedly met with bidders and/or financial advisors either alongside or apart from the Special Committee, including on: June 12, 2017; June 20, 2017; June 22, 2017; June 26, 2017; September 6, 2017; March 8, 2018; May 29, 2018; and December 6, 2018. Moreover, the Special Committee neither retained independent legal counsel nor hired an independent financial advisor. The Special Committee was "independent" in name only and did not even remotely approach the requirements for cleansing the Board's debilitating conflicts of interest.

52.    On May 19, 2017, shortly after the Individual Defendants empaneled the Special Committee, offers came in from five bidders ranging in value from $30 million to $40 million in gross cash consideration: Party B's proposal indicated a gross cash consideration between $35 and $40 million; Party C's proposal indicated a gross cash consideration between $30 and $36 million; Party D's proposal indicated a gross cash consideration of $34 million; Party E's proposal indicated a gross cash consideration between $30 and $35 million; and Hyper Pet's proposal indicated a gross cash consideration between $35 and $37.5 million.

53.    On June 12, 2017 Steven and Dean Tsengas met with Party C. On June 15, 2017, Party E dropped out of the sales process. On June 20, 2017 Steven and Dean Tsengas met with Party D. On June 22, 2017, Steven and Dean Tsengas met with Party B. On June 26, 2017, Steven and Dean Tsengas met with Hyper Pet.

54.    On July 31, 2017, Party A executed a confidentiality agreement with OurPets. After two weeks of negotiations, Party A made an undisclosed offer that the Individual Defendants deemed not to meet the Company's valuation expectations. Afterwards, the Individual Defendants had no further contact with Party A. Similarly, on August 24, 2017, Party C made an undisclosed offer that the Individual Defendants deemed not to meet the Company's valuation expectations. Afterwards, the Individual Defendants had no further contact with Party C.

55.    On August 5, 2017, Party D dropped out of the sales process.

56.    On September 6, 2017, Hyper Pet met with Tsengas and team at the Ourpets' facilities. The next day, Hyper Pet met with the Special Committee. At that meeting the parties agreed to table discussions until OurPets developed a new set of financial projections.

57.    On December 14, 2017, the Board met and approved the revised projections. Subsequently, FRG sent the revised projections to Hyper Pet, but not Party A or Party C.

58.    On January 19, 2018, Party F provided FRG with a proposal to purchase all of the outstanding shares of OurPets indicating a gross cash consideration between $31 and $38 million. But not until March 8, 2018, did Tsengas and team bring Party F in for a meeting at the Ourpets' facilities. Subsequently, Party F was granted access to the electronic data room. However, the Proxy gives no indication to whether Party F signed a confidentiality agreement and, if so, what the terms of that confidentiality agreement contained.

59.    On March 20, 2018, Party B dropped out of the sales process.

60.    On April 12, 2018, Party F provided its final valuation of OurPets to FRG. However, it was determined that party F's "consideration was below what the special committee would support at the time, and further conversations with Party F ceased." Proxy at 32. The amount of the offer is withheld from the Proxy. After the offer, all further communication with Party F ceased.

61.    On April 16, 2018, Hyper Pet submitted a renewed and significantly depressed bid for less than $24.5 million. By May 16, 2018, Hyper Pet had lowered their bid to $1.16 per share, or less than $23.3 million. On May 29, the Individual Defendants—not the Special Committee—met and determined to proceed exclusively in merger discussions with Hyper Pet. And on June 5, 2018, OurPets and Hyper Pet entered into the exclusivity agreement.

62.    Due to conflicts of interest, FRG was unable to issue a fairness opinion in support of the Merger. Accordingly, on September 10, 2018, the Special Committee engaged Boenning for the sole purpose of issuing a fairness opinion.

63.    Naturally, once Hyper Pet had achieved exclusivity, it ratcheted down on price. On November 14, 2018, Hyper Pet submitted its final offer of $1.00 per share, or approximately $20 million.

64.    On December 6, 2018, Steven and Dean Tsengas, alongside the Special Committee, met telephonically with Boenning to discuss the Merger and the fairness opinion.

65.    On December 14, 2018, the Individual Defendants met with their legal and financial advisors and approved the Merger.

66.    Between December 14 and December 18 undisclosed negotiations occurred between counsel for OurPets and counsel for Hyper Pet. On December 18, 2018, the Merger Agreement was executed between OurPets and Hyper Pet.

67.    On December 20, 2018, Steven Tsengas, Dean Tsengas, Joseph T. Aveni, PZ Holdings Ltd. and several other significant shareholders executed a voting and support agreement with hyper Pet agreeing to vote all 54.6% of their OurPets stock in favor the Merger. This last sentence of the Background of the Merger Section of the Proxy was its first mention of the existence or discussion of a voting agreement.

III.    **The Majority of the Board and Special Committee Possessed Disabling Conflicts of Interest and the Individual Defendants Derived Unique Benefits from the Merger at the Expense of OurPets Common Shareholders**

68.    As the founder, president, CEO, Chairman of the Board, and largest shareholder, Steven Tsengas exercised control over the business and affairs of OurPets.  As such he exerted significant control and influence over the remaining members of the Board. As discussed in greater detail above, Steven Tsengas was also significantly involved in and controlled the negotiations surrounding the Merger. His holdings in the Company and other outside interests render him conflicted for the purposes of negotiating the Merger.

69.    Additionally, Spirk and MacMillan also suffer disabling conflicts for the purpose of negotiating the Merger based on their deep ties to PZ Holdings.

70.    However, in enacting the Special Committee, the Individual Defendants appointed MacMillan, a conflicted director, in a disheartened attempt to remove the taint of conflict. Thus, a majority of the Board and the Special Committee were conflicted in negotiating the sales process leading up to the Merger.

71.    This conflict had a tremendous impact on the Merger and resulted in numerous unique benefits for the conflicted directors. First, the Rollover Shareholders, including Individual Defendants Steven Tsengas, Charles MacMillan, and John Spirk—a majority of the Board and Special Committee—will continue to share in the future earnings of the post-Merger Company.

72.    Second, upon the closing of the merger, Steven Tsengas will enter into a consulting agreement with Hyper Pet. Under this agreement, Steven Tsengas will serve as the New Product Consultant of Hyper Pet to assist Hyper Pet's new product development teams.

73.    Third, Dean Tsengas will enter into an employment agreement with Hyper Pet. Under this agreement, he will serve as the Executive Vice President of Operations of Hyper Pet. For his services, Dean Tsengas will be paid an annual salary of $185,000, and he is eligible for a performance bonus each year with a minimum target of 20% of his base salary.

74.    Fourth, Senk Properties LLC, an entity entirely owned by the Tsengas family will continue in its lease agreements with the post-Merger company.

75.    Fifth, Nottingham-Spirk Design Associates, Inc., a company founded by John Spirk, will continue in its development agreements with the post-Merger company.

76.    By allowing the conflicted directors to participate in the Merger and extrapolate benefits for themselves ahead of OurPets commons shareholders, each of the Individual Defendants have violated their fiduciary duties of good faith, care, and loyalty.

IV.    **The Individual Defendants' Agreement to Preclusive Deal Protection Provisions Foreclosed Superior Offers from Emerging and the Voting and Support Agreements Deprive Shareholders of Their Corporate Suffrage Rights**

77.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for OurPets.

78.    First, the Merger Agreement contains a no solicitation provision that prohibited the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for OurPets shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not:

(i) solicit, initiate or knowingly encourage or take any action to facilitate any inquiries or the making of any proposal or offer that constitutes, or may reasonably be likely to lead to, any Takeover Proposal, (ii) provide any non-public information, or afford access to the properties, books, records, or personnel of the Company or any of its Subsidiaries to, or knowingly assist, participate in, facilitate or encourage any effort by, any Person that the Company, any of its Subsidiaries, or any of its or any of its Subsidiaries' respective Agents has reason to believe is considering

making, or has made, any Takeover Proposal, (iii) enter into or maintain or continue discussions or negotiate with any Person in furtherance of such inquiries or to obtain a Takeover Proposal or otherwise in connection with any Takeover Proposal, (iv) approve, endorse, recommend, or execute or enter into any letter of intent, agreement in principle, merger agreement, acquisition agreement or other similar agreement relating to a Takeover Proposal (other than an Acceptable Confidentiality Agreement entered into pursuant to Section 4.02(c) (an "Acquisition Agreement") or any proposal or offer that could reasonably be expected to lead to a Takeover Proposal, (v) amend or grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of the Company or any of its Subsidiaries, (vi) take any action to exempt any Person from, or make any acquisition of securities of the Company by any Person not subject to, any state takeover statute or similar statute or regulation that applies to the Company with respect to a Takeover Proposal or otherwise, including the restrictions on "business combinations" set forth in the CBCA, except for Parent, Merger Sub or any of their respective Subsidiaries, or the Transactions, or (vii) resolve or agree to do any of the foregoing or otherwise authorize or permit any of its Agents to take any such action.

Proxy at A-28.

79.     Additionally, the Merger Agreement granted Hyper Pet recurring and unlimited informational and matching rights, which provided Hyper Pet with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) two business days to negotiate with OurPets, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

80.     The non-solicitation and matching rights provisions essentially ensured that a superior bidder would not emerge, as any potential suitor would undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Hyper Pet can easily foreclose a competing bid. As a result, these provisions unreasonably favor Hyper Pet, to the detriment of OurPets' public shareholders.

81.     Lastly, the Merger Agreement provides that OurPets must pay Hyper Pet a termination fee of $750,000—over 4% of the cash value of the Merger Consideration—in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal. The termination fee provision further ensured that no competing offer would emerge, as any competing bidder would have to pay a naked premium for the right to provide OurPets shareholders with a superior offer.

82.     Ultimately, these preclusive deal protection provisions restrained the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

83.    Moreover, on December 20, 2018, Steven Tsengas, Dean Tsengas, Joseph T. Aveni, PZ Holdings Ltd. and several other significant shareholders executed a voting and support agreement with Hyper Pet agreeing to vote all 54.6% of their OurPets stock in favor the Merger. By executing the Voting and Support Agreement, the Individual Defendants foreclosed any meaningful input from OurPets minority shareholders.

84.    The Merger only required approval by a simple majority of common shares, and the Individual Defendants declined to implement a "majority of the minority" voting requirement; thus, Plaintiff and the Class were unable to prevent the Merger from being consummated. Individual Defendants request for shareholders to vote on the Merger was therefore illusory, as their votes could not stop the Merger from going forward.

## V.    The Individual Defendants Breached Their Duty of Candor by Disseminating the Materially Incomplete and Misleading Proxy Statement

85.    The Defendants further exacerbated their breaches of fiduciary duty by disseminating the materially incomplete and misleading Proxy to OurPets shareholders on February 13, 2019.  As a result, shareholders were not fully informed when they voted on the Merger.

86.    The Proxy failed to disclose material information related to the Merger, including information regarding: (i) the Company's financial projections; (ii) the valuation analyses conducted by Boenning; (iii) the background of the Merger; and (iv) the conflicts of interest faced by FRG.

87.    First, the Proxy omits critical financial projections, including the unlevered free cash flow projections for OurPets (the "Cash Flow Projections").  Investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the expected unlevered free cash flows?  Without unlevered free cash flow projections, the Company's shareholders were not able to answer this question and assess the fairness of the Merger Consideration.

88.    As stated in the Proxy, to perform its Discounted Cash Flow Analysis of OurPets Boenning utilized projections for OurPets' unlevered free cash flow through calendar year 2023, which were provided by or prepared based upon direct input from OurPets management.  Proxy at 42.  It is indisputable that the Cash Flow Projections were the most important input in Boenning's Discounted Cash Flow Analysis—the entire analyses are based upon discounting the Cash Flow Projections to present value.  However, Defendants elected to exclude the Cash Flow Projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of Boenning's Discounted Cash Flow Analysis and the Company's projections.

89.    Moreover, in summarizing Boenning's Discounted Cash Flow Analysis on page 42, the Proxy stated that two separate methods were utilized to determine the Company's terminal value: the perpetuity growth rate method and the terminal exit multiple method. The perpetuity growth rate model was based off of the Company's unlevered free cash flows, while the exit multiple method was based off the Company's EBITDA. The EBITDA exit multiple method resulted in a valuation $0.64 to $0.80 per share for the Company. While the cash flow growth rate method resulted in a valuation of $1.01 to $1.34 per share for the Company. In other words, valuing the Company based on EBITDA makes the Merger Consideration appear fair, but valuing the Company based on cash flows shows that the Company is in fact worth more than the Merger Consideration. This indicates that by disclosing the EBITDA projections but withholding the Cash Flow Projections, Defendants have mislead shareholders regarding OurPets' value.

90.    In light of the significant differences between the Cash Flow Projections on the one hand, and the EBITDA figures disclosed in the Proxy, the table of projections on page 37 of the Proxy were materially incomplete and misleading because, by failing to include the Cash Flow Projections, the tables provide a materially incomplete and misleading overall valuation picture of the Company.  Simply put, unlevered free cash flow projections are irreplaceable.

91.    Second, with respect to the *Discounted Cash Flow Analysis* prepared by Boenning, the Proxy fails to disclose the following key components—in addition to the omission of the Cash Flow Projections—used in their analyses: (i) the inputs and assumptions underlying the calculation of the various discount rate ranges (including the WACC/CAPM components); and (ii) the actual terminal values calculated.  These key inputs were material to shareholders and necessary for them to properly follow and assess Boenning' Discounted Cash Flow Analysis. As one of the leading scholars on the issue wrote in explaining the fundamental flaws of fairness opinions, and why it is so important for shareholders to be provided with key valuation inputs:

A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses…there is still an element of subjectivity present in the choice and application of these methods. *The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses*…There are a number of different underlying valuation analyses upon which a fairness opinion can rest…in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus. However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness…*Each of the techniques in and of themselves is also prone to subjectivity*. For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to

determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars. However, again there is no standard-setting or other body guiding these or other preparation decisions. Rather, a discounted cash flow analysis, like other valuation analyses, is typically compiled using historically developed and unguided industry practices as influenced and first put forth by academic practitioners. This lends itself to differences in valuation approach in each application and among institutions as each of them develops their own individual approach. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

*This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions…*

Steven M. Davidoff, *Fairness Opinions*, 55 AM. U.L. REV. 1557 (August, 2006).

92.    Third, with respect to the Background of the Merger, the Proxy omits a litany of material facts regarding the sales process leading up to the Merger, including: (i) the final bids of Party A, Party C, and Party F; (ii) the timing and nature of the negotiations surrounding the Voting and Support Agreement; (iii) the timing and nature of the negotiations surrounding the continued employment of Steven and Dean Tsengas; (iv) the timing and nature of the negotiations surrounding the continuation of the Senk lease agreements; (v) the timing and nature of the negotiations surrounding the continuation of the Nottingham-Spirk Design development agreements; and (vi) the nature of the negotiations that occurred after the Board approved the Merger but before the Merger Agreement and Voting and Support Agreement were enacted. Once a proxy statement travels down the road of partial disclosure of the history leading up to a merger the duty of disclosure requires Defendants to provide shareholders with an accurate, full, and fair characterization of those historic events. All of this omitted information directly relates to the Individual Defendants' faithful execution of their fiduciary duties and therefore was material for OurPets shareholders to judge the fairness of the sales process leading up to the Merger.

93.    Further, the Proxy states that OurPets and multiple parties entered into confidentiality agreements, but fails to disclose whether such agreements contained a standstill provision and/or a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect. On page 58 the Proxy states that in order for OurPets to engage with any new party, such party must "enter[] into a confidentiality agreement with provisions relating to confidentiality and standstill arrangements that are no less favorable to OurPets than the provisions of the confidentiality

agreement entered into with Parent." Furthermore, OurPets agreed that it will not "Amend or grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of OurPet's or any of its subsidiaries." *Id*. These statements indicate that standstill agreements were a regular part of the confidentiality agreements OurPets executed and that DADW provisions were in effect.

94.     Accordingly, the express communication of the existence of such provisions is material to OurPets shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal.  The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. If those confidentiality agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly.

95.     This issue is particularly important here given the circumstances surrounding the bids and excommunication of Party A, Party B, and Party F. Given the fact that all three parties were not heard from after submitting their last bid would indicate that standstill and DADW provisions precluded them from bidding.

96.     Thus, the omission of this material information renders the descriptions of the confidentiality agreements the Company entered into in the *Background of the Merger* section of the Proxy misleading.  Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

97.     Fourth, the Proxy fails to disclose any potential conflicts of interest between FRG and Hyper Pet or Guardian. Such information is plainly material to OurPets shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial advisor's efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its role in the Merger. Put simply, a reasonable shareholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the shareholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.

98.     In sum, the Defendants breached their duty of candor by failing to ensure that the Proxy provided OurPets shareholders with all material information regarding the Merger.  As a result, shareholders were not fully informed when they voted on the Merger.

## FIRST CAUSE OF ACTION

### Claims for Breaches of Fiduciary Duties Against the Individual Defendants in Their Capacities as OurPets' Directors and/or Officers

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    Based on the above-referenced conduct, the Individual Defendants breached the fiduciary duties of good faith, care, loyalty, candor and their duty to produce to each shareholder the best possible return for their investment (*i.e.* maximize shareholder value) they owed directly to the former public shareholders of OurPets.

101.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, unfairly deprived Plaintiff and other members of the Class of the true value of their personal property, their OurPets shares.

102.    As demonstrated by the allegations above, the Individual Defendants intentionally breached the fiduciary duties they owed to the shareholders of OurPets.  The Individual Defendants intentionally inflicted harm on OurPets shareholders by: intentionally failing to take reasonable steps to obtain and/or ensure that OurPets shareholders received fair consideration for their shares (including conducting the fundamentally flawed sales process described above and declining to pursue better strategic alternatives to maximize shareholder value, including the Company's stand-alone business plan); agreeing to restrictive deal protection provisions in the Merger Agreement and standstill agreements that deterred other suitors from making a superior bid for the Company; placing their personal financial interests ahead of those of the Company's shareholders; and failing to disclose material information to the Company's shareholders in the incomplete and misleading Proxy.

103.    The Individual Defendants dominated and controlled the business and corporate affairs of OurPets, and were in possession of private corporate information concerning OurPets' assets, business, and future prospects.  Thus, there was an imbalance and disparity of knowledge and economic power between them and the public shareholders of OurPets which made it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

104.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants intentionally abdicated their fiduciary duties owed directly to Plaintiff and the other members of the Class and inflicted significant financial harm upon said shareholders.

105.    As a result of the actions of the Individual Defendants, Plaintiff and the Class have suffered harm, in that they have not received fair consideration for their shares, and have been prevented from obtaining a fair price for their common stock.

106.    Plaintiff and the members of the Class seek equitable relief in the form of rescission and/or rescissory damages for the Individual Defendants' breaches of fiduciary duty.

## SECOND CAUSE OF ACTION
### Claim for Breaches of Fiduciary Duties Against Steven Tsengas in His Capacity as a Controlling Shareholder of OurPets

107.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

108.    Steven Tsengas exercised control over the business and affairs of OurPets. Steven Tsengas beneficially owned and controlled over 26% of OurPets' common stock, and together with his son Dean Tsengas over 31%.  Furthermore, Steven Tsengas, at all relevant times, served as OurPets' Chairman of the Board, President, and CEO of the Company.  As such Steven Tsengas exerted significant control and influence over the remaining members of the Board, and was a controlling shareholder of OurPets.  Steven Tsengas was also significantly involved in and controlled the negotiations surrounding the Merger.

109.    As a controlling shareholder of the Company, Steven Tsengas owed Plaintiff and the Class fiduciary duties of loyalty, good faith, due care, candor, and the duty to maximize shareholder value for all shareholders.

110.    Steven Tsengas breached his fiduciary duties owed to the unaffiliated public shareholders of OurPets.  By the acts, transactions and courses of conduct alleged herein, Steven Tsengas, individually and acting as a part of a common plan, unfairly deprived Plaintiff and the Class of the true value of their OurPets shares.

111.    As demonstrated by the allegations above, Steven Tsengas failed to exercise the necessary care required, acted disloyally and in bad faith, and breached his fiduciary duties as controlling shareholder by, among other things:

    (a)    extracting personal financial benefits for himself and his family in connection with the Merger, including the Rollover Shares for himself and his son, continued employment for himself and his son, and continuing the lease agreements for the company entirely owned by him and his family;

    (b)    failing to properly value Plaintiff's and the Class's shares;

    (c)    failing to act independently to protect the interests of the Company's unaffiliated shareholders;

    (d)    failing to adequately ensure that no conflicts of interest existed between his own interests and his fiduciary obligations; and

    (e)    failing to ensure that all conflicts of interest were resolved in the best interests of the Company's unaffiliated public shareholders.
.

-21-

112.    As a result of Steven Tsengas' breaches of fiduciary duty as controlling shareholder, Plaintiff and members of the Class seek equitable relief in the form of rescission and/or rescissory damages.

### THIRD CAUSE OF ACTION
### Claim for Aiding and Abetting Against OurPets

113.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

114.    OurPets aided and abetted the remaining Defendants' breaches of their fiduciary duties owed to the public shareholders of OurPets, including Plaintiff and the members of the Class.

115.    The Individual Defendants owed to Plaintiff and the members of the Class certain fiduciary duties as fully set forth herein. Additionally, the Steven Tsengas owed fiduciary duties to Plaintiff and the Class in his capacities as an officer of the Company and as a controlling shareholder of the Company.

116.    By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Plaintiff and the members of the Class.  As described above, OurPets aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to Plaintiff and the members of the Class. Amongst other actions, OurPets facilitated the filing and dissemination of the materially incomplete and misleading Proxy that was used to solicit shareholders to vote in favor of the Merger.  OurPets is identified as the registrant in the Proxy. Further, the special meeting was held as OurPets' executive offices. Additionally, the Merger Agreement was entered into by and between OurPets, Hyper Pet, and Merger Sub. Furthermore, OurPets was responsible for providing Boenning with prospective financial information, which was then insufficiently summarized in the Proxy.

117.    As a result of the aiding and abetting of OurPets, Plaintiff and the members of the Class seek equitable relief in the form of rescission and/or rescissory damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in his favor and in favor of the Class and against all Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative and his counsel as Class counsel;

B.    Declaring and decreeing that the Merger Agreement was unlawfully entered into and that the Merger was consummated in breach of the fiduciary duties of the Defendants;

C.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiffs and the Class rescissory damages;

D.      Awarding Plaintiff the costs of this action, including reasonable fees and expenses of Plaintiff's attorneys and experts; and

E.      Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

**Plaintiff demands a jury trial on all issues and in all proceedings so triable.**

DATED:  April 1, 2018                              <u>s/ Karen Cody-Hopkins</u>
                                                 Karen Cody-Hopkins
                                                 *Attorney for Plaintiff*

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
*Attorneys for Plaintiff*